**In re John F. NAPPY, Debtor.**

**Securities Investor Protection Corporation, Plaintiff,**

v.

**John F. Nappy, Defendant.**

**Bankruptcy No. 895–81248–288. Adversary No. 895–8293–288.**

United States Bankruptcy Court, E.D. New York.

Oct. 13, 1999.

---

Kenneth J. Caputo, Deputy General Counsel, Securities Investor Protection Corp., Washington, DC, for plaintiff.

John Franklin Nappy, Malverne, NY, defendant pro se.

## MEMORANDUM OPINION DETERMINING NONDISCHARGEABILITY OF CLAIM HELD BY THE SECURITIES INVESTOR PROTECTION CORPORATION

STAN BERNSTEIN, Bankruptcy Judge.

I. Introduction: An Overview.

A. The Parties.

The plaintiff, Securities Investor Protection Corporation (SIPC), is a non-profit membership corporation created under the Securities Investors Protection Act (SIPA), 15 U.S.C. § 78aaa *et seq.* One of SIPC's members was John Franklin Associates, Inc. (JFA), a securities broker-dealer registered with the United States Securities and Exchange Commission (SEC) as well as a SIPC member. The chapter 7

debtor and defendant in this adversary proceeding is an individual named John Franklin Nappy (Nappy); he was a director, controlling shareholder, and president of JFA. SIPC liquidated the assets of JFA in a proceeding filed in this Court.

One of JFA's customers was Swedish Medical Center (SMC) whose unsecured claim had been allowed in the SIPA liquidation.[1] SIPC's claim arose from the debtor's alleged misappropriation of funds that SMC had remitted to JFA for the purchase of securities (Claim). SMC then assigned its rights in the Claim to SIPC.

## B. The Adversary Proceeding.

SIPC filed its complaint against Nappy for a determination that the Claim was nondischargeable under 11 U.S.C. §§ 523(a)(2)(A) and (4).[2] Under the first branch of its complaint, SIPC alleges that Nappy engaged in a pattern of actual fraud against SMC; under the second branch, SIPC alleges that Nappy embezzled funds that are directly traceable to SMC wire-transfers to JFA or one of its affiliates by transferring those funds to his own personal accounts and using those proceeds for his personal benefit.

Nappy's denial of, and affirmative defense to, SIPC's allegations is rather complex and often inconsistent. In the main, however, Nappy denies that he retained any personal benefit from SMC's funds, claims that he did not authorize any im-

proper transfers of SMC's funds to his personal account, or, alternatively, claims that he is entitled to some of those transfers of SMC's funds as proper reimbursement for his prior personal advances to JFA on SMC's behalf.

## C. The Trial and the Witnesses.

This proceeding took ten days to try over a six-week period. The principal witnesses for the plaintiff were Theodore W. Barrow, an Examiner employed by SIPC, and Josephine Wang, Esq., SIPC's in-house general counsel.[3] SIPC's trial narrative was simple and straight-forward, saying, in effect: "We followed Swedish's money through several intermediary bank accounts into Nappy's hands; he used over $1,000,000 of Swedish's money for his own personal benefit; and he did not pay it back. His liability and the resulting damages are excepted from the order of discharge."

The thrust of Mr. Barrow's disciplined testimony was a recounting of his detailed tracing of the cash flows among the various accounts maintained by JFA, Nappy, and John Franklin Co. with respect to the allowance of the Claim. This testimony was graphically summarized in two diagrams (SIPC 12) tracing those cash flows, which he tied into his very elaborately annotated spread sheets (SIPC 11). Ms. Wang testified at length about her role in the SIPC liquidation of JFA, her supervi-

---

1. SIPC also took assignments of claims in modest amounts from two other JFA customers, Messrs. Kiront and Hildebrand. In its complaint, SIPC initially included the assigned claims of Kiront and Hildebrand as part of its allegations and damages, but at the commencement of this trial, SIPC waived these two de minimis claims in order to simplify its proofs.

2. The Court has jurisdiction over the subject matter of this case under 28 U.S.C. §§ 134(a), (b) and 157(a). This is a core proceeding

under 28 U.S.C. § 157(b)(2)(I). Venue is proper under 28 U.S.C. § 1408.

3. SIPC also called Frank Gemino, a former officer of JFA—Vice President of Sales, as a witness, but the Court finds that his testimony added little weight to SIPC's case in chief. Gemino's function at JFA was to develop the "retail accounts," to train and supervise other retail salesmen, and he had no involvement in SMC's trading activities.

sion of Mr. Barrow's overall investigations, her detailed review of SMC's proof of claim, and her efforts over many months to respond to various "leads," inquiries, and challenges from Nappy concerning his claims and defenses.

Despite repeated urging by the Court that the debtor retain experienced trial counsel to assist him, Nappy persisted in representing himself.[4] He cross-examined SIPC's two principal witnesses for three long days during which he repeatedly tried to argue his principal affirmative defenses. Based upon active listening to that cross-examination, this Court finds that Nappy failed to impugn the credibility of either of these witnesses.

At the conclusion of SIPC's case in chief, Nappy was ordered to submit his own direct testimony in writing under oath. The Court explained to Nappy that it was his burden to present a compelling counter-narrative. He tried to meet that bur-den through a series of memoranda and exhibits. At the request of the Court, Nappy summarized his testimony in the form of a more comprehensive exhibit (Proposed Nappy 40)[5] that not only subsumed SIPC 12, but also purported to show diagrammatically why SIPC 12 was critically incomplete and, thus, materially misleading. Nappy was also granted the opportunity to submit supplemental pleadings and memoranda by a deadline following the conclusion of the trial; he, in fact, filed lengthy and convoluted[6] post-trial memoranda, including some submissions that fell considerably past the extended deadline. This Court has declined to give any probative weight to any of Nappy's untimely-filed post-trial submissions which, in any event, were largely redundant of prior submissions.

Nappy also called eight witnesses in his defense.[7] These included: (i) two former

---

4. At the time of trial, Nappy was a recent graduate of City University of New York—Queens Law School. He acknowledged that he would not be admitted to the bar because he could not satisfy the standards of its character and fitness committee due to his prior consent to an SEC judgment that bars him from the securities industry. This trial was made exceedingly difficult by Nappy's inability (i) to prepare his witnesses effectively, (ii) to introduce documents into evidence properly, (iii) to conduct a proper direct or cross-examination, or (iv) to frame proper objections to questions of opposing counsel. For its part, SIPC was represented by its very experienced litigation counsel, Kenneth N. Caputo, Esq., who showed a truly remarkable degree of professionalism in trying to accommodate a pro se litigant. On numerous occasions, Caputo assisted Nappy in locating the particular document that the latter sought to introduce or use in connection with the direct and cross-examination of witnesses.

5. Nappy 40 titled Diagram of the flow of funds a) into and out of John Franklin & Associates checking accounts at Natwest, b) from Swedish Medical Center's securities account at Raymond James, c) from John Nap-py, and d) from Tom Black showing no misappropriation of Swedish Medical Center's funds.

6. Nappy seemed constitutionally incapable of presenting his story in concise terms; every further telling was more and more elaborate and more and more circuitous.

7. Nappy listed other potential witnesses in the joint final Pre-trial Statement, dated September 25, 1997, but he could not locate three of them: Bethel Lawson ("Sonny") Greenhalgh—a former JFA salesman, Canise Ferrigno—a NatWest banking employee, and Paul DaVersa—a former JFA salesman. The Court entered an order quashing Nappy's subpoena of Eric Nordlinger—an SEC representative, and denied Nappy the opportunity to call Thomas Kiront on the ground that his testimony was not relevant after SIPC waived its claim against Nappy with respect to monies it paid to Kiront. Nappy was permitted to call Donley as an expert witness over SIPC's strenuous objection. The trial had to be continued in order to give SIPC's trial counsel an opportunity to take a deposition of Donley so that he could be prepared for cross-examining the accountant at trial.

JFA securities brokers or salesmen, Douglas Nevin and Paul Laude, (ii) a business and social acquaintance and sometime private lender, Gino Camparetto, (iii) a former JFA office manager, Kathleen Davis, (iv) two account officers at Merrill Lynch, Rick Walsh, III and Judy Aune, who were familiar with his options trading history, (v) an IRS appeals officer, Steven Wurman, and (vi) Nappy's expert witness, an accountant named George Donley. From the Court's perspective, after considering the testimony of these witnesses, the only testimony of any potentially material relevance to Nappy's defense came from the last two persons. Wurman's and Donley's testimony is discussed *infra*.

After considering the full record in this adversary proceeding, the Court has determined to enter a judgment of nondischargeability in favor of SIPC based upon the findings of fact and conclusions of law set forth in this Memorandum.

II. Background.

A. The Nappy Affiliates.

In September 1984, Nappy, the debtor-defendant, formed a securities broker-dealership known as JFA and registered it with the SEC. He was the principal shareholder of JFA. Nappy also formed and controlled an affiliated company doing business as Harbor Financial Corporation; this affiliate operated from the same building and address as JFA's. JFA conducted a general securities business, clearing its securities transactions on a fully-disclosed basis through Raymond James & Associates, Inc. (Raymond James) except as to mutual fund transactions which it "self-cleared". Nappy had also established a company named John Franklin & Co. (JFC). Nappy actively traded through JFA, Harbor Financial, and Raymond James for his own personal investment account. Nappy claimed a special expertise and early success in the sophisticated trading of options on margin.

One of the defining characteristics of Nappy's business dealings was that he, his wife, Lori Tortelli, and his various business affiliates opened and maintained a substantial number of commercial checking accounts at various banks, with most of these accounts at National Westminster Bank (Natwest). The better part of trial time was expended in analyzing the flow of funds back and forth among these various accounts over a seven-month period in 1985–86, for the gravamen of SIPC's complaint is that Nappy embezzled customer funds for his own benefit. The accounts referred to in the exhibits admitted into evidence during the trial include the following:

| Account Holder | Accounts at Natwest | Exhibits |
| --- | --- | --- |
| John F. Nappy | 7009110812 (0812) | Nappy 11 |
| Lori Tortelli Nappy | 7009706785 (6785) | Nappy 11 |
| JFA | 2–009–61–1564 (1564) (Money Market) | SIPC 6 A/B, 6 A/C, 29 and 30 |
| JFA | 2–015–60–6028 (Special Account) | SIPC 21 |
| JFC | 2–009–61–4841 (4841) | SIPC 6 A.D., 6, 39 N.Y.S. 746 A/E and 19 |
| Harbor Financial | 84034684 | SIPC 26 |

| Account Holder | Accounts at Ray./James | Exhibits |
| --- | --- | --- |
| John F. Nappy | 42223563 (3563) Personal trading account | SIPC 6 A/F and 6 A/G |

JFA entered into a clearing house agreement with Raymond James which has its principal offices in Florida. Among the customers for which JFA acted as a broker in placing orders for mutual funds were SMC, Pekin Memorial Hospital (Pekin), and Cy–Wayne F.C.U. (Cy–Wayne). From September of 1985 through May of 1986, SMC had placed several orders for the purchase of Putnam and Oppenheimer mutual funds with (and through) JFA.

In March of 1986, JFA was experiencing operational difficulties. At the suggestion of a representative of Raymond James, Nappy hired one of its employees, Janet Sanders (Sanders), to assist JFA in its day-to-day operations and administration. In the April of 1986, Nappy then hired Frank Gemino (Gemino), who had been previously employed by Drexel Burnham, as JFA's Vice President of Sales.

In the summer of 1986, Nappy married Lori Tortelli. The Nappys then spent most of the month of August of 1986 on a honeymoon in Europe. Upon his return to the United States in late August, Nappy claims to have discovered for the first time that the accounts for SMC and Cy–Wayne were "short." He and other management and accounting personnel then attempted to reconcile the mutual funds accounts and bank statements.

### B. The Suspension of JFA.

In August of 1986, Gemino, Sanders, and Charles Mattingly, Jr., counsel for JFA and/or Nappy, approached the SEC and advised it that there were unresolved and unexplained accounting irregularities in some of JFA's customer accounts. This triggered a preliminary investigation by SEC. During this investigation, Nappy resigned from JFA and SEC suspended trading activities at JFA. Upon the advice of counsel, Nappy entered into a consent judgment on behalf of both JFA and himself with the SEC that terminated the broker-dealership. The SEC then arranged for the sale of the tangible assets of JFA to another dealership, "Robert Thomas," a Raymond James subsidiary. Gemino joined Robert Thomas as its President. The Robert Thomas dealership then hired several of JFA's former salespersons, brokers and other personnel.

On November 5, 1986, upon a Complaint for Permanent Injunctive and Other Relief, filed by the SEC against Nappy, the United States District Court for the Eastern District of New York entered a Final Judgment of Permanent Injunction by Consent (Final Judgment), *Securities and Exchange Commission v. John F. Nappy*, Case No. 86 Civil 3739 (Glasser, J.). Also on November 5, 1986, Nappy executed a Consent Decree which became a part of the Final Judgment. The Consent Decree includes a provision requiring Nappy to disgorge assets in an amount not less than $400,000 to SIPC as trustee for the liquidation of JFA as necessary to cover customer's claims against JFA.[8]

Under SIPA § 78eee(a)(1), SIPC was notified that JFA was in or was approaching financial difficulty. Under SIPA § 78eee(a)(3), SIPC then filed an application for a protective decree. Thereafter, and concurrent with the filing of the Final

---

**8.** Nappy stated in his testimony that he never read the consent decree and just signed blank signature pages at the direction of his attorney. Nappy further stated that he has now sent a letter to the district court disavowing the affidavit accompanying the consent decree—more than 12 years later. Nappy has engaged in a practice of first entering into a stipulation on the record and then later repudiating it when that serves his immediate purpose. This occurred throughout the pretrial, trial, and post-trial phases of this case on numerous occasions. This practice materially impaired his credibility with this Court.

Judgment and the Consent Decree in the SEC action, the District Court entered a protective decree commencing a SIPA liquidation proceeding of JFA. The protective decree was based upon a finding that customers of JFA were in need of the protections afforded by SIPA. The District Court then appointed SIPC as trustee for the liquidation of the business of JFA. On December 1, 1986, under an SEC Order Instituting Public Administrative Proceedings, Findings and Order Imposing Remedial Sanctions in *In the Matter of John F. Nappy*, Admin.Proc. File No. 3–6756, and on the basis of Nappy's actions as the principal of JFA, Nappy was permanently barred from association with any broker, dealer, investment company, investment advisor or municipal securities dealer.

As part of the JFA liquidation, Theodore W. Barrow and Josephine Wang, Esq., of SIPC analyzed the claims filed by each customer to determine which claims would be allowed and in which amounts. Of the several JFA clients that filed claims with the SIPC, only the claims of SMC and two other clients, Mr. Kiront and Mr. Hildebrand, were allowed. SIPC determined that SMC suffered a shortfall in the amount of $1,029,430.

SIPC eventually arranged for the payment of SMC's Claim in full. The source of funding came from (i) the proceeds of the JFA liquidation, (ii) the monies paid by Nappy under the Consent Decree, and (iii) the balance in advances from SIPC through assessments against its member broker-dealers.

The SEC then moved to reopen *Securities and Exchange Commission v. John F. Nappy*, Case No. 86 Civil 3739 (Glasser, J.). The District Court entered an order on July 15, 1991 granting that motion so that SIPC could amend that portion of the Final Judgment fixing the final amount of the disgorgement Nappy had to pay to SIPC as trustee for JFA. Nappy was ordered to pay to SIPC the sum of $583,044.48. On November 21, 1991, SIPC, as trustee, filed with this Court its Investigatory and Final Reports and Proposed Final Allocation and Distribution of Property (Reports) in the SIPA liquidation proceeding of JFA. On December 30, 1991, after a hearing in which appearances were made by both SIPC and Nappy, and over the objections set forth on the record by Nappy, the Bankruptcy Court entered an Order Approving the Reports.[9] By assignment dated January 27, 1992, SIPC, as trustee for the liquidation of JFA assigned its interest in the Final Judgment, as amended, to SIPC in its corporate capacity.

C. Nappy's Personal Bankruptcy Case.

On March 7, 1995 Nappy filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On August 15, 1995, Nappy's chapter 11 case was converted to a case under chapter 7 of the Bankruptcy Code. On June 2, 1995, SIPC commenced the present adversary proceeding. It took another two and one-half years for discovery to be completed and before a final pretrial session could be scheduled; these delays were due in large part to Nappy's repeated failure to comply with earlier discovery deadlines. Indeed, SIPC found itself forced to take depositions of Nappy's witnesses after the beginning of the trial

---

**9.** Nappy throughout the trial sought to dispute the claims made by the customers of JFA that were reimbursed by SIPC. Nappy already had his opportunity to dispute those claims. Whatever objections he made were overruled when a prior judge of this Court, the Honorable Robert J. Hall, entered an order approving SIPC's claims report on December 30, 1991. Furthermore, Nappy formally accepted liability for the claims in the consent order. This trial was solely for the purpose of determining whether Nappy's conduct surrounding the customer claims should be declared nondischargeable.

because Nappy had failed to notify SIPC of the witnesses' residences or business addresses and telephone numbers as he was required. The Court continued the trial from time to time to accommodate Nappy's "critical need" to call these witnesses.

### D. Summary of SIPC's Complaint.

SIPC alleges that Nappy, as director and president of JFA, controlled JFA's operations, all JFA's bank accounts, and accounts at other broker-dealers and financial institutions. SIPC alleges that by means of this control, Nappy embezzled and used more than $1,000,000 of SMC's funds for his personal benefit. Nappy's actions included using the funds to trade options and other securities in his personal securities account. The $1,000,000 was intended by SMC to be used to purchase $500,000 in shares in Oppenheimer funds and $500,000 in shares in the Putnam mutual funds in 1986. From SMC's records, account statements from Putnam and Oppenheimer, wire transfers, and SMC's proof of claim, SIPC reconstructed the flow of SMC's funds through JFA for the period of September 1985, when SMC began buying securities through JFA, through December 1986 (SIPC 11) and traced those funds to Nappy's personal securities account.

## III. FINDINGS OF FACT [10]

### A. The SMC/Oppenheimer Mutual Fund Transactions.

#### 1. Undisputed Facts.

With respect to the following material facts, there is no dispute: Before February 7, 1986, SMC redeemed several of its investments held in the form of various commercial notes and bonds. On February 7, 1986, SMC wire-transferred $500,000 from its Heritage Cash Trust Account at Raymond James. That amount was posted to JFA's NatWest account # 1564 on February 10, 1986 [SIPC 6 A/A, 6 A/B and 13]. As of February 7, 1986, the date of SMC's wire transfer, Account # 1564 had a prior balance of $1,449.77 [SIPC 6 A/B].

The next activity in account # 1564 was on February 11, 1986 when a check in the amount of $495,000 from the account, made payable to "John Franklin," [11] was deposited in JFC's NatWest account # 4841 [SIPC 6 A/C and 6 A/D]. This account had a balance of $6,643.92 before the transfer [SIPC 6 A/B]. On that same day, a check in the amount of 180,000 was written from account # 4841 to Nappy's personal securities account # 3563 at Raymond James. Account # 4841 had a total balance of $321,543.92 at the end of the day with the $495,000 deposit and with withdrawals of $180,000 and $100 as the only transactions recorded in the account [SIPC 6 A/D]. The next day, February 12, Nappy wrote three checks against account # 4841: (a) $180,000 made payable to himself, (b) $94,569.02, of which he deposited $40,000 into his Raymond James account # 3563, $49,569.02 was deposited into the account of a JFA customer, Tom Black, and $5,000 was paid to two JFA brokers. [SIPC 6 A.D., 6 A/E, 6 A/F, and 14]. On February 13, 1986, Nappy depos-

---

**10.** This Analysis should be treated as the Court's Findings of Fact under Fed.R.Bank.P. 7052 presented in narrative form. For ease of exposition, this section of the Opinion deals separately with two fairly discrete transactional sequences respecting SMC's aggregate claim and occurring at different times: Part A

(The Oppenheimer Mutual Funds Transactions) and Part B (the Putnam Mutual Funds Transactions).

**11.** The $495,000 was the $500,000 purchase price less the broker's 1% commission.

ited the second $180,000 into his personal Raymond James account # 3563; this was the deposit of the $180,000 check which he had drawn against his account # 4841 the day before, as noted above. [SIPC 6A/F]. Other than $5,000, there were no other deposits into account # 4841 between February 11 and February 13, 1986. In this manner, SIPC traced a total of $400,000 of SMC's February 7, 1986 $500,000 wire transfer in these several steps right into Nappy's personal securities account.

### 2. Nappy's Affirmative Defenses.

Nappy stipulated at trial that $400,000 of SMC's $500,000 wire-transfer did, in fact, go into his personal securities account at Raymond James, and that he received the personal benefit of these funds. Having stipulated to these facts on repeated occasions during the trial, Nappy later sought to vitiate the logical and legal significance of this stipulation by claiming that the $400,000 represented a reimbursement that SMC owed him for a January 14, 1986 dealer purchase order of $500,000 of Oppenheimer funds which JFA had placed on behalf of SMC. That purchase order had a settlement date of January 21, 1986. Nappy testified that SMC had intended to pay for that purchase order with the proceeds of the sale of three $1,000,000 bonds [12] on January 16, 1986. The bond sale did not clear by the settlement date because one of the bonds was unregistered. Nappy argued that in order to maintain SMC's business, he advanced his personal funds in order to cover the January 14, 1986 purchase order. Those ad-

vances were made on January 23 and 24, 1986 respectively by Nappy's transferring (i) $250,000 from his and Tortelli's joint account # 6785 and (ii) $250,000 from his own account # 0812, and depositing these amounts into JFA's account # 1564. On January 28, 1986, there was a transfer of $518,000 from JFA's account # 1564 into JFC's account # 4841. On that same day, $495,010 was withdrawn from account # 4841.

Nappy has failed to prove his affirmative defense at several levels of analysis. In general, Nappy produced no evidence that SMC had requested or expected him to advance personal funds to cover any of SMC's purchases of securities. If he were doing this as some sort of business favor or accommodation to a major client of JFA's, the law does not excuse Nappy's utter disregard for the proper form of transactions between a corporation and its principal director, officer, and shareholder. Nappy produced no notes or other corporate records of JFA authorizing these "borrowings" from Nappy or setting forth the terms of repayment. This Court can not condone Nappy's treating his personal and the JFA customer accounts as interchangeable, fungible, or consolidated, especially when JFA was established to operate as a registered and regulated broker-dealer in publicly-traded securities.

Secondly, Nappy's reconstruction of these events is implausible; his story makes no business sense.[13] Among other

12. These bonds were G.M.A.C.Med. Term, Wells Fargo Med. Term Notes, and MLPFS 1st Interstate Bank Corp. CA notes. (SIPC 11 & 36). Each of these notes had a face value of $1,000,000.

13. Were Nappy not a pro se defendant, the approach of this Court would be to have summarized SIPC's presentation of its evidence, found that this evidence satisfied SIPC's bur-

den—a "preponderance of the evidence" standard, and held that as a matter of law, the Claim was nondischargeable. The Court would then have found that the affirmative defenses were not proven, and no effort would have been made to refute them or, short of that, to spell out their implausibility at length. But since Nappy appeared pro se, the Court has tried hard to make sense of Nappy's affirmative defenses. That may be

things, Nappy failed to produce any credible evidence that the proceeds from the sale of the notes and bonds held as investment by SMC were designated for the Oppenheimer transaction. The Court has reviewed the detailed affidavit of Nicolette K. Danker (Danker), SMC's Director of Corporate Finance, copies of ledger sheets, and account statements that accompanied SMC's proof of claim that was allowed in the SIPC case.[14]

SMC's proof of claim does not refer to any bond transaction that was intended for a January 14, 1986 trade. As a dealer purchase, there was no urgency to have the January 14 Oppenheimer trade settled by January 21 because dealers have thirty days from a trade date to settle an order. Nappy did not start to liquidate his own funds until two days after what would have been the "settlement date" for non-dealers and he did not transfer the funds to Oppenheimer until one week after that "settlement date." Therefore, there was no time pressure or business reason to have Nappy make advances to JFA due to any presumed inability on the part of SMC to release the necessary funds for the January 14 trade.

Unfortunately for Nappy, SMC's Oppenheimer statements for the relevant period do not lend themselves to any consistent reading of the facts. Nappy's own exhibits contain National Westminister bank statements for the relevant period

that were already included in SIPC's exhibits.[15] The only other account statements in Nappy's exhibits were those from Merrill Lynch relating to Harbor Financial Services which were for the period of March through November of 1986 and reflect only purchases and sales of options and United States Treasury bonds. The Harbor Financial Services statements do not identify whether any of the trades were made on behalf of JFA clients, other customers, or shareholders or investors in Harbor Financial Services. Since Nappy has not produced other business records to support his reconstruction of the transactional events, he has failed to prove a crucial component of his affirmative defense. As indicative of the confusion created by the limited extant records, a January 14 trade was not reflected in SMC's Oppenheimer statements until January 28. The January 14 trade however, was in the amount of $500,004.12, not the $495,010 that Nappy claimed to have covered. (Presumably the difference in these two figures is that the lower one reflects JFA's crediting itself in advance with a broker's one percent commission that would be payable by the Oppenheimer Funds.) Although two Oppenheimer statements do reflect that a January 27, 1986 direct purchase in the amount of $495,010 was made; subsequent statements, one of which contained the notation "Corrected Statement," no longer listed the January 27 direct purchase of $495,010.[16] Ultimately,

---

more than a pro se defendant with Nappy's business and legal sophistication is entitled to.

**14.** The proof of claim has been admitted into evidence and the Court can not permit Nappy to relitigate the issue of whether SMC's proof of claim was properly allowed. Not only has the Bankruptcy Court entered an order in the SIPC liquidation of JFA's assets allowing SMC's claim, but the District Court has also approved the Consent Degree against JFA and Nappy on November 5, 1986, thus confirming SMC's claim.

**15.** Nappy 11 and SIPC 6 and 21.

**16.** Oppenheimer statements of SMC's account show that on January 27, 1986 there was a "direct purchase" of shares for $495,010. On January 28, 1986, Oppenheimer issued two account statements. The first statement shows the January 27, 1986 direct purchase for $495,010 again. The second statement marked "PERMANENT COPY—IMPORTANT—*HOLD* FOR TAX PURPOSES" no longer listed the direct purchase of $495,010. Instead there was a January 14, 1986 dealer

it seems that SMC was credited only with the $500.004.12 dealer purchase during the month of January 1986.

Although the Court cannot determine the source of the $500,004.12 for the January 14 purchase from the records before it, Nappy's argument of reimbursement is further weakened by the possibility that the SMC may have wired funds for that purchase three weeks before when it placed an order for $1,000,000 worth of shares in Oppenheimer. SMC's ledger shows that there was a December 27, 1985 purchase order for $1,000,000 worth of Oppenheimer shares. As of January 23, 1986 only $500,0000 worth of Oppenheimer shares from that purchase order had been credited to SMC's account. According to SMC's ledger sheet, that December $1,000,000 purchase order was followed by a February 21, 1986 purchase order for $500,000 worth of Oppenheimer shares. SMC's proof of claim does not show that it placed an order on January 14 for $500,000 of Oppenheimer. Danker, in her affidavit, does not mention a January 14, 1986 trade, but does state that:

> there have been mistakes in the past with the Oppenheimer accounts. For instance, in December of 1985, I had problems regarding a purchase in the Oppenheimer fund which was not reflected in statements until about four months after the purchase.

(Danker's affidavit, p. 2). A review of all SMC's Oppenheimer statements included in its proof of claim shows a March 3, 1986 "Corrected Statement" which lists the January 14, 1986 $500,004.12 dealer purchase.

Some of these Oppenheimer statements reflected a direct purchase in the amount of $495,010, but Nappy did not and can not explain why that entry disappears in later Oppenheimer statements. Perhaps no cogent and convincing explanation can be given of these inconsistent statement so many years after the events occurred, but it was Nappy's burden to prove the validity of his reconstruction of these events. SMC's proof of claim and Oppenheimer statements do not provide the Court with sufficient guidance to identify the source of the funds for the $500,004.12 dealer purchase. It appears plausible to this Court that if SMC had placed a $1,000,000 purchase order for Oppenheimer funds in December of 1985 and SMC was only credited with $500,000 in December, then the January 14, 1986 purchase can only be constructed as representing the balance of SMC's December 27, 1985 $1,000,000 purchase order.

Given the ambiguity of the source of the funds for the January 14, 1986 Oppenheimer purchase, the Court finds that Nappy's reimbursement theory is not supported by the facts. Nappy has not adequately rebutted SIPC's showing that SMC's wire transfer of $500,000 on February 7, 1986 went into his personal trading account and the account of another JFA client. After repeated review and analysis of the testimony, the records, extensive exhibits and memoranda for months on end, this Court cannot make any findings that Nappy has proven his affirmative defense by a preponderance of the evidence, given the many irregularities in the business practices and the record-keeping. Therefore, SIPC has sustained its burden of proof by a preponderance of the evidence that the $500,000 funds wired from SMC to JFA on

---

purchase in the amount of $500,004.12. Later account statements continue to show that the only purchase in January of 1986 was the January 14 order in the amount of $500,004.12. A March 3, 1986 Oppenheimer account statement containing the words "Corrected Statement" again shows only a January 14 dealer purchase by JFA in the amount of $500,004.12.

February 7, 1986 were not for reimbursement of Oppenheimer funds, but were for a purchase order of $500,000 worth of shares in Putnam Hi–Income Mutual Fund that instead went to Nappy's personal securities account and thus for his personal benefit.

No portion of the $500,000 invested by SMC on February 7, 1986 for the purchase of shares of a Putnam mutual fund were credited to any account for the benefit of SMC. Rather, SMC's purchase order for approximately $500,000 worth of shares of the Putnam Fund on February 7, 1986 was actually paid for with SMC's transfer of $500,000 to JFA on February 19, 1986. SIPC 13 and 17. Neither JFA nor Nappy used SMC's monies to pay for a Putnam mutual fund share purchase for SMC. Consequently, SMC filed a claim in the SIPA liquidation proceeding of JFA for its loss of this $500,000 as part of its total claim for losses in excess of $1 million, SIPC 36, which claim was allowed, and which result was approved by order of the Bankruptcy Court. SIPC 9.

### B. Putnam Hi–Income Mutual Fund Transactions.

#### 1. SIPC's Proofs.

On February 21, 1986, SMC transferred $500,000 to JFA for the purchase of shares of Oppenheimer funds. SIPC's principal witnesses testified credibly that Nappy converted these funds for his own personal benefit. Based upon SIPC's witnesses' testimony, SIPC exhibits as well as Nappy's testimony and his exhibits, SIPC has proven that Nappy converted or embezzled this $500,000 as well. This chapter of the story is not easy to narrate because of the several linked transactions it covers. In

this respect, its complex structure follows the contours of a classic Ponzi scheme.[17]

Less than one week later, on February 27, 1986, Nappy received a margin call for $400,000 from Raymond James to cure the insufficiency in his personal options trading account # 3563. [SIPC 6, ¶ 13] Nappy admits this occurred. On that very same day, JFA received an order to purchase $500,000 worth of shares of Oppenheimer Funds for its customer, Pekin Memorial Hospital.

That same day, February 27, 1986, Nappy drew a check against the JFA # 1564 account, made payable to Raymond James to pay the $400,000 margin call. [SIPC 28] That check was dishonored for insufficient funds in the account. Indeed, the # 1564 account had a very modest balance of $6,449.74 when the $400,000 check was presented for payment. SIPC 29. After numerous deposits and credits on February 28, 1986, the balance in the # 1564 account rose to $694,297.23. *Id.* On March 3, 1986, $400,000 was wire-transferred from the # 1564 JFA customer account to Raymond James to pay for Nappy's margin call [SIPC 30].

On April 14, 1986, SMC wire-transferred $1,000,000 to JFA's customer account, # 4841 for the purchase of $500,000 of shares in Putnam Funds and $500,000 of shares in Oppenheimer Funds. [SIPC 16 and 18]. Before the deposit of SMC's $1,000,000 was made, the # 4841 account had a balance of $67,735.24. After the deposit was recorded, and in conjunction with "same-day" checks drawn on the account in the amounts of $46,430 and $5,000, the balance in the account was $1,016,305.24. [SIPC 19] Four days later, on April 18, 1986, two checks were drawn against the account: one in the amount of

---

**17.** The Court is not suggesting that Nappy intentionally engaged in a Ponzi scheme; the term is used solely in its descriptive sense, evocative of long chains of the transfer of funds.

$500,002 .44, and the second in the amount of $453,520.00. [SIPC 19 and 20] Both of these checks, and the check in the amount of $46,430, were deposited into JFA's Special Account at Natwest, # 6028. [SIPC 21]

The funds in the Special Account # 6028 were later withdrawn in five consecutively numbered checks (## 1003–1007) to pay for the purchase of shares in two different mutual fund purchases. The first of these two mutual fund purchase transactions involved checks # 1003–# 1005, in the respective amounts of $46,430, $448,570, and $5,000, for an aggregate of exactly $500,000. [SIPC 21]. Although earmarked for purchasing $500,00 in mutual funds for SMC, the same $500,000 was, in fact, used by Nappy or an affiliate to purchase $500,000 in shares in a Franklin mutual fund for Cy–Wayne. [SIPC 22]. Cy–Wayne had previously transferred $500,000 to JFA for the purchase of shares of a Franklin mutual fund [SIPC 23,] but its $500,000 was diverted by Nappy to an account at First Interstate Bank of Denver [SIPC 24] and, thereafter, used to pay for the purchase of shares of an Oppenheimer mutual fund for yet another customer of JFA, Pekin Memorial Hospital. [SIPC 25]

The second of the two mutual fund purchase transactions involved checks # 1006 and # 1007, in the respective amounts of $494,752.41 and $5,250.03, for an aggregate of $500,002.44. [SIPC 21] These funds were, indeed, used to purchase shares of a Putnam mutual fund for SMC. [SIPC 17] Thus, of the $1,000,000 that SMC had arranged to be deposited into the # 4841 account on April 14, 1986, only $500,000 was credited to an account for the benefit of SMC. The remaining $500,000 was used to benefit a customer of JFA other than SMC. Consequently, SMC filed a claim in the SIPA liquidation proceeding of JFA for its loss of this $500,000 as part of its total claim for losses in excess of $1 million [SIPC 36]. SMC's claim was allowed incident to the approval of SIPC's final report by order of the Bankruptcy Court [SIPC 9]. JFA did make the purchase in the Putnam fund, however, the other $500,000 is unaccounted for.

## 2. Nappy's Counter–Narrative.

Nappy sought to prove a complicated and convoluted defense with respect to these transactions, but once again that defense is not supported by any documentary or other written evidence beyond his own testimony, which this Court finds is not credible. Nappy maintains that there was $500,000 in Ginnie Maes in an account at Harbor Financial Service.[18] This would account for SMC's shortfall and that its payment for Oppenheimer was unlikely because that trade would have been 'busted', since the order was made on February 21 and the payment for it was received in April. It is Nappy's contention that Cy–Wayne was credited with an extra $500,000 worth of Franklin Fund shares. Nappy states that Cy–Wayne originally made an order in that amount on March 5. The commission charged, however, was too much, so that trade was canceled and rebilled for March 19 with the correct commission. Nappy, again without any credible evidence, states that JFA must have paid for both trades and that Cy–Wayne only paid for one.[19] In this respect, all

---

18. In SMC's proof of claim, Ms. Danker asserts that Nappy told her that the reason the $500,000 Oppenheimer purchase did not appear on her statement was because it was still in JFA's name. There was no mention of a Harbor Financial account.

19. Nappy alleges that he sued Cy–Wayne for receiving $500,000 worth of a fund in October of 1986 in which it paid no money. Nappy states it settled out of court. This account fails to explain how Nappy had standing to sue because this was JFA's cause of action,

that Nappy has done is to raise the tantalizing possibility of an alternative explanation that, in many respect, collapses from its own weight. But to sketch out an alternative explanation is not the same as proving that it occurred, which is Nappy's burden that he has failed to carry.

With respect to the check returned by the bank marked "NSF", Nappy testified that he had written a $400,000 check on his personal account at Citibank made payable to his personal account at Natwest. He then wrote a check on that account in the same amount to JFA's account at Natwest against which he next drew a check to cover his margin call. During this same time, he attempted to execute a number of trades in his margin account that would have released sufficient funds to cover the margin call. He claimed that Tom Osborne of Raymond James had canceled the trades; Osborne took it upon himself to prohibit Nappy from trading in this account until Osborne and others had a chance to review the account. Nappy claimed he tried again to enter the trades to cover the margin, but that Osborne canceled them again. So, as his counter-response, Nappy stopped payment on the Citibank check; that, in turn, eventually led to the return of the JFA Natwest check for insufficient funds. Nappy's explanation begs the critical question why did he issue the $400,000 check in the first place, if he planned on making trades to cover the margin. These explanations reek of after-the-fact reconstructions teased out years after the transactions occurred.

Nappy further contended that Osborne was the person who caused the $400,000 to be illegally wire-transferred from the JFA account. When Nappy complained, Osborne told him that "that's Natwest's problem, not mine." Nappy also testified that he decided to stop pursuing Osborne because of other overriding business considerations; namely, Nappy did not want to disrupt the clearing arrangement which JFA had with RJ, nor to disrupt the internal operations of JFA. Nappy also stopped trading in his Raymond James account, and that resulted in a $790,000 loss in that account. Nappy claimed that he decided to absorb this loss as well in order to protect JFA.[20] All that this proves is that $400,000 in a JFA customer's funds were transferred into Nappy's own account, and that Nappy for his own business reasons permitted those funds to remain in that account and be lost.

Even if one were to assume that Osborne had wrongly wired the $400,000 and that then Nappy later refused to trade in that account, the important point is that Nappy deliberately took no action to pursue a recovery from Osborne or Raymond James. He also knew or should have known that by not trading in the options held in that account, the value of those options would be lost, as occurred, and that loss would wipe out the $400,000 in customer funds. Under no legitimate conception of tort law can Nappy point to Osborne as an "independent and superseding cause" that relieves the former of personal liability to his customers. Nappy's primary reason for not pursuing a remedy against Osborne was that he did not want to jeopardize the overall business relationship with Raymond James. All that

and not his. In addition, Mr. Nappy provided no evidence of these events other than his own testimony.

20. Nappy maintains that he was trading his wife's account in the same manner and, but

for Osborne's interference, he would have made money. Of course, Nappy provided no documentary or other credible evidence for this assertion.

means is that, in the end, he traded the loss of $400,000 in client funds in order to preserve a profitable relationship that would benefit him personally either directly or through his investment as the owner of JFA. Under these circumstances, Nappy has to be held personally liable for the ensuing loss to his customers.

After round and round of reconstructive effort, as evinced in his later memoranda, Nappy claimed he had borrowed $400,000 to cover the margin call wire. He claimed he borrowed the sums of $250,000 from Gino Camparetto, $50,000 from his Uncle Al Croce, $20,000 from Sonny Greenhalgh, and the rest from the John Franklin commissions account, and that this was the money used in the Osborne wire. Nappy's version of the event is not credible. First of all, during Mr. Comparetto's testimony, when Nappy sought to have his witness testify to the exact timing of the loan, the witness stated that loan was made in January, not in late February. Also, if Nappy had borrowed money, that gives rise to the next question: why did he deposit it into a JFA customer account to cover a margin call on a personal account. In addition, in earlier testimony, Nappy stated that he had the money in his personal Citibank account, he had no reason to borrow the money. Thus, the Court is faced with a plethora of "plausible" but inconsistent explanations. A far more likely explanation, although it is not necessary for its proofs, is SIPC's suggestion that Nappy probably answered the margin call with Pekin Memorial Hospital funds, and then Nappy had to scramble to replace those funds. The Court makes no finding as to this matter other than to conclude that Nappy's affirmative defense fails.

C. Testimony of Steven Wurman, IRS Appeals Officer.

As a part of his defense, Nappy produced an Internal Revenue Service (IRS) report that concluded that Nappy had no tax liability for any misappropriation of funds. The Nappys' joint tax return was selected for audit by the IRS. After an investigation by a revenue agent, the IRS issued a notice of deficiency to the Nappys. Among the items listed in the Notice of Deficiency was an assessment for misappropriation in the amount of $972,925. The revenue agent had become aware of the alleged misappropriation from a report submitted by SIPC. Nappy filed a petition with the Tax Court. Before the Tax Court heard the matter, the case was assigned to Steven Wurman (Wurman), an Appeals Officer for the IRS since 1982. Wurman testified that his job is to settle controversies in excess of $100,000 fairly and impartially between taxpayers and the IRS before the cases have to go to the Tax Court.

Wurman testified that while he realized that a misappropriation of customer funds had, in fact, occurred, his limited task was to determine whether Nappy had personally benefitted to the extent that it would trigger a taxable event. Wurman's investigation relied, in large part, on the revenue agent's report and file, and on the documents requested from Nappy, and the spreadsheets prepared by Theodore Barrow, the SIPC accountant. Wurman explained that one problem was that the revenue agent's report and file were not particularly helpful; the revenue agent did not meet with Nappy at his home or office in order to determine whether Nappy's physical surroundings suggested that he was living beyond his means.

Under cross-examination by SIPC, Wurman admitted that he did not review any SMC documents, any other SIPC documents, nor any accounts Nappy held for the trading of securities, commodities, or options. Although his investigation included the issue of whether Nappy had trans-

ferred money into his accounts or to a third party's account, Wurman admitted that he reviewed only the records for one bank account which Nappy provided. Thus, Wurman did not review SMC's Oppenheimer and Putnam Account Statements and the statements and accounts of other JFA clients. In order to understand the spreadsheets prepared by SIPC, Wurman would also have had to review SMC's proof of claim, but he did not do that either. The failure to review the books and records of JFA, in which Nappy had a significant interest in, resulted in an incomplete investigation that failed to consider the use of JFA and JFC as possible vehicles for inappropriate activity.

Based upon the limited documentation reviewed, Wurman admitted that he would not be surprised that certain clients did not receive their funds—the records were in such disarray. Nevertheless, he concluded that based upon this limited information, the IRS had insufficient evidence to present a strong case that Nappy had personally benefitted from any misappropriation and that a taxable event had arisen. Wurman prepared a Supporting Statement that authorized the reduction of Nappy's tax liability to zero. (Incidentally, the Supporting Statement was never produced by Wurman or by Nappy. Indeed, as SIPC pointed out, there was no reference to the Supporting Statement in Wurman's deposition.) The Court finds that Wurman's testimony was not credible with respect to Nappy's denial that he did not convert any customer funds. Not only was Wurman's investigation radically insufficient as a matter of due diligence, but his general demeanor and repeated comments strongly suggested that somehow he has come to believe that his primary function

is to settle appeals in favor of the taxpayer in order to reduce the agency's workload.[21] This attitude may have resulted in a favorable ruling for Nappy vis-a-vis the IRS, but it surely undercuts Wurman's credibility before this Court that Nappy did not misappropriate customer funds for his own personal benefit. If nothing else, all that Wurman's testimony established is that he did not look very hard before overturning an agent's finding of a tax liability chargeable to Nappy.

### D. Testimony of George A. Donley, Nappy's Accountant.

Nappy also produced, as his expert witness, George A. Donley (Donley) to question the accuracy and completeness of SIPC's analysis of Nappy's accounts. Donley has been a CPA for approximately 25 years. He holds an undergraduate degree from Pace University and a graduate degree in taxation from St. John's University. Donley has been self-employed for the last 19 years. He has never qualified as an expert in any case, has not done an audit for misappropriation in over 20 years, and is not a certified fraud examiner. Donley also has never reviewed any documents in connection with the allowance or disallowance of a claim in a SIPC proceeding, nor reviewed any documents from a federal or state agency that is charged with investigating fraud or misappropriation. He has not published an article or treatise nor held a teaching position or a professorship, and has never audited a broker/dealer. The Court, with great reservation, qualified him as an expert witness because Nappy, a pro se litigant, so fervently and repeatedly insisted that Donley's testimony was absolutely crucial to

---

**21.** The Court reaches this finding because for reasons explained infra, the ruling of the IRS that the misappropriation was not a taxable event to Nappy does not satisfy the standard

of collateral estoppel. Thus, Nappy would need Wurman to prove that, based on Wurman's impartial investigation, Nappy did not convert customer funds for his own benefit.

his presenting his defense. In the end, the Court decided that as a cautionary measure, Donley's testimony would be weighed rather than initially excluded from admissibility.

The main focus of Donley's testimony was that SIPC violated the auditing concept of 'completeness.'[22] Donley asserted that all auditors must look at all documents and financial statements before making conclusions, so that even one missed document can result in an erroneous conclusion.

Applying this concept, Donley testified that SIPC violated this tenet by failing to consider Nappy's, his spouse's, and Harbor's CMA account at Merrill Lynch. Donley maintained that funds were withdrawn from this account and used for the benefit of SMC. Donley further testified that the account had more than $1,000,000 in profits and that Nappy made frequent withdrawals. Donley did agree that SIPC's tracing of the funds was correct, but that it simply ignored Nappy's Harbor account.

When Donley was cross-examined by SIPC, he was unable to show any documentation to support his conclusions. Donley spent only eight hours reviewing the numerous documents in the case, and he admitted upon cross-examination that he never looked at any SMC investment documents. Donley further admitted that he had no idea what kind of business Harbor conducted. Donley finally admitted that he formed his conclusion based upon what Nappy told him happened. In light of all this, the Court finds that Donley's testimony is entitled to no evidentiary weight.

IV. Discussion.

A. Collateral Estoppel as to IRS Ruling.

Despite Nappy's attempt to apply the IRS's determination of no tax liability for an alleged misappropriation to this case by asserting the doctrine of collateral estoppel, the Court finds that the IRS's determination does not satisfy that doctrine. In order to find collateral estoppel, the court must find that: (1) the issues before this court are identical to the issues that were actually and necessarily decided in a prior action, and (2) the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue. *In re Krautheimer*, 210 B.R. 37 (Bankr.S.D.N.Y.1997).

While the cause of action before this Court concerns the nondischargeability of indebtedness and the cause before the Tax Court was the tax liability of Nappy, the ultimate issue of whether Nappy committed embezzlement and misappropriation are the same. However, the issues were never actually and necessarily decided by a court of competent jurisdiction. Upon the debtor's filing of the petition, the IRS's deficiency claim against the debtor was removed from Tax Court to Bankruptcy Court, while Lori Tortelli's case remained before the Tax Court. While the automatic stay was still in effect, Nappy continued to discuss and argue his case with Wurman.

SIPC also never had a full and fair opportunity to litigate the issues. The JFA liquidation proceedings before the District Court never reached the issues of misappropriation, fraud, and embezzlement. A Consent Decree was entered into by SIPC and Nappy and approved by the

---

**22.** Donley was unable to point to any official definition of this concept used by any recog- nized accounting association.

District Court whereby Nappy consented to never associate himself with any broker-dealer and to disgorge funds to reimburse losses suffered by JFA customers. There was never any finding by the District Court as to SIPC's allegations of fraud, embezzlement, and misappropriation.

■ Collateral estoppel can not only bind actual parties to a lawsuit, but also their privies. *Conte v. Justice,* 996 F.2d 1398, 1402 (2d Cir.1993) (citing *Watts v. Swiss Bank Corp.,* 27 N.Y.2d 270, 277, 317 N.Y.S.2d 315, 265 N.E.2d 739 (1970)). Privity includes those who exercised practical control over an action. *Id.* In this case, to the extent that Nappy attempts to have the IRS's determination of no tax liability for misappropriation apply to this nondischargeability action brought by SIPC, the Court finds that no privity exists between the IRS and SIPC. The IRS is a governmental agency while SIPC is a private statutory corporation. While the IRS may have became aware of Nappy's alleged misappropriation through SIPC's report, Wurman's investigation was conducted independently of SIPC. SIPC's only role was to provide information or explanations requested by Wurman. The IRS's investigation was to determine whether Nappy had benefitted from the alleged misappropriation and as a result incurred unreported tax liability. SIPC did not control the direction nor the process of the IRS's investigation. Thus, the Court finds that the doctrine of collateral estoppel cannot be applied.

B. Nondischargeability—Standard of Proof.

■ In this adversary proceeding, SIPC seeks a judgment finding Nappy's debt to SIPC to be nondischargeable under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(4). The determination of nondischargeability of a debt under § 523 is a "core" proceeding.

28 U.S.C. § 157(b)(2)(I). Thus, this Court has the authority to enter a final order and judgment. SIPC has the burden of proof, and must prove its case by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 283–291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). However, once SIPC establishes a *prima facie* case, the burden shifts to Nappy to rebut SIPC's proof. *See Barclays/Am. Bus. Credit, Inc. v. Adams (In re Adams),* 31 F.3d 389, 393 n. 1 (6th Cir.1994); *Caspers v. Van Horne (In re Van Horne),* 823 F.2d 1285, 1288 (8th Cir.1987).

C. § 523(a)(4)—Embezzlement.

■ 11 U.S.C. § 523(a)(4) creates an exception to discharge in bankruptcy for obligations incurred based on the debtor's embezzlement. "Embezzlement" under § 523(a)(4) is generally defined under federal common law; namely, the fraudulent appropriation of the property of another by a person to whom such property has been lawfully entrusted or into whose hands it has lawfully come. *See Chemical Bank v. Marcou (In re Marcou),* 209 B.R. 287, 293 (Bankr.E.D.N.Y.1997); *Barristers Abstract Corp. v. Caulfield (In re Caulfield),* 192 B.R. 808, 818 (Bankr.E.D.N.Y. 1996); *Marriott Intl., Inc, Employee Profit Sharing, Savings & Retirement Plan & Trust v. Suarez (In re Suarez),* 1996 WL 480809 (E.D.N.Y.1996); *Moore v. United States,* 160 U.S. 268, 269, 16 S.Ct. 294, 40 L.Ed. 422 (1895); *Transamerica Commercial Fin. Corp. v. Littleton (In re Littleton),* 942 F.2d 551, 555 (9th Cir.1991); *Farina v. Balzano (In re Balzano),* 127 B.R. 524, 533 (Bankr.E.D.N.Y.1991).

■ The elements of a cause of action based on embezzlement are:

(1) that the creditor entrusted his property to the debtor;

(2) that the debtor appropriated the property for a purpose other than that for which it was entrusted; and,

(3) the circumstances indicate that the debtor acted with fraudulent intent or deceit.

*Littleton,* 942 F.2d at 555. In *Balzano,* 127 B.R. at 533, the court held that "[t]o prove embezzlement, the creditor must demonstrate both that the debtor appropriated funds for his own benefit, and did so with fraudulent intent." (Citations omitted.)

█ Whenever a client places his monies in the care of a broker-dealer, the client does so with the understanding that the broker-dealer is to apply those monies towards a purchase of securities for the client's benefit. It is apparent from the record that SMC did not give JFA any discretionary trading authority. JFA, in securing SMC's business, is held to have represented to SMC[23] that JFA would invest SMC's monies in the manner in which SMC had instructed it to do. Thus, when SMC placed orders with JFA for the purchase of shares of various mutual funds, SMC did so upon the representation that JFA would carry out its instructions to acquire shares of that fund on or soon after the order was placed with the proceeds transferred to JFA for that purpose. Thus, the first element is established.

█ Where the broker does not have discretionary trading authority, the relationship between a broker and the customer, however, is still one of principal and agent. The relationship arises when an order to buy or sell is placed, and terminated when the transaction is completed. The broker's duty is "to 'use reasonable efforts' to give the principal information relevant to the affairs entrusted to it. The affair entrusted to a broker who is to buy or sell through an exchange is to execute the order, not to discuss its wisdom." *Limbaugh v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 732 F.2d 859, 862 (11th Cir.1984); *see also Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 337 F.Supp. 107, 111 (N.D.Ala.1971), *aff'd,* 453 F.2d 417 (5th Cir.1972). The duty owed by the broker was simply to execute the customer's order. *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 120 (2d Cir.1991). "The broker, once he has received his customer's funds, is a fiduciary with respect to those funds." *Gilman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 93 Misc.2d 941, 944, 404 N.Y.S.2d 258 (N.Y.Sup.Ct.1978). In *Gilman,* the central issue involved whether a stockbroker violated a fiduciary duty to its customers by withholding funds due to them for a period of twenty-four hours or more in order to profit from the interest on the proceeds from the sale of securities. The court held that after an investment is sold and the proceeds come into the broker's possession, the broker may not intentionally use these proceeds to the detriment of his customer and for his own benefit. *A fortiori,* a fiduciary relationship is found in this case where the broker is entrusted with

---

**23.** The acts and misrepresentations perpetrated by Nappy were against SMC. However, because SIPC, as trustee for the liquidation of JFA, paid SMC's claim, SIPC as trustee was subrogated to all rights and causes of action of SMC. *See* SIPA § 78fff–3(a); *In re Bell & Beckwith,* 937 F.2d 1104, 1107–1108 (6th Cir. 1991); *Redington v. Touche Ross & Co.,* 592 F.2d 617 (2d Cir.1978), *rev'd on other grounds Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). Furthermore, the judgment which forms the basis of the present action was entered by the United States District Court for the Eastern District of New York against Nappy in favor of SIPC. Thereafter, by assignment dated January 27, 1992, SIPC, as trustee for the liquidation of JFA assigned all right, title, and interest in the judgment to SIPC in its corporate capacity.

customer funds and is instructed to execute purchase order *for* shares of mutual funds. That fiduciary duty is breached when the broker misappropriates those funds for his own personal benefit and the benefit of others.

As SMC's broker, JFA had a fiduciary obligation to execute orders to buy shares of Putnam and Oppenheimer funds and to apply the monies wired in for those trades. As described in the detailed findings under sections III(A) and (B) of this Memorandum, SIPC has established that Nappy embezzled a total of $800,000 in funds of SMC for his own personal benefit. It is also appropriate to add to the amount for which he is both personally liable, the diversion by Nappy of another $54,569.02 in customer funds to pay $49,569.02 to Tom Black, and another $5,000 to two JFA brokers, for a total of $854,569.02 as the principal component of his personal liability and damages. His improper exercise of control of those additional amounts justifies including that additional $54,569.02 to his personal liability.

Finally, the Court can infer from the facts and circumstances that Nappy misappropriated SMC's funds with fraudulent intent. *See Moonan v. Bevilacqua (In re Bevilacqua),* 53 B.R. 331, 334 (Bankr.S.D.N.Y.1985)(circumstantial evidence can be used to show fraudulent intent.) Nappy transferred and subdivided SMC's monies among numerous bank accounts before finally depositing the funds in his personal account, and the account of Tom Black. There was no conceivable legitimate business purpose for doing so. In addition, Nappy used monies from a subsequent deposit by SMC for a purchase of mutual fund shares to pay for a prior purchase order that had never been effected, and Nappy used SMC's monies to pay for investment transactions of other customers. SMC ultimately bore the loss of Nappy having paid his margin call with JFA customer funds. These multiple layers of accounts, transactions, and customers are clear evidence of Nappy's intent to perpetrate his fraudulent scheme with customer funds, namely SMC's. Thus, the third element of embezzlement is established.

The foregoing conclusively proves that Nappy embezzled SMC's monies, and falls with the scope of § 523(a)(4). Of the one million dollar loss, SIPC has shown that Nappy personally benefitted from $854,569.02; therefore, Nappy's indebtedness to SIPC is excepted from discharge in the principal amount of $854,569.02.

## D. § 523(a)(2)(A)—Actual Fraud.

 As an alternative (or overlapping theory of nondischargeability), 11 U.S.C. § 523(a)(2)(A) creates an exception to discharge in bankruptcy for obligations that arise from conduct that amounts to actual fraud under common law. *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 444, 133 L.Ed.2d 351 (1995). The elements of a cause of action under § 523(a)(2)(A) are not enumerated in the statute, but have been interpreted to incorporate the common law elements of proof. *See Fowler Bros. v. Young (In re Young),* 91 F.3d 1367, 1373 (10th Cir.1996). The elements are:

(1) that the debtor made a false representation;

(2) that the debtor made the representation with the intent to deceive the creditor;

(3) that the creditor reliance was justifiable;

(4) that the creditor's reliance caused the creditor to sustain a loss.

*Id.*

 Actual fraud requires a representation of a material fact, generally in

the form of an affirmative or overt statement, but it may also mean silence by the debtor with respect to or concealment of a material fact. *Id.* at 1375; *Farraj v. Soliz (In re Soliz),* 201 B.R. 363, 369 (Bankr. S.D.N.Y.1996). The second element of proof contemplates that Nappy have knowledge of the falsity when the representations were made, or acted with a reckless disregard as to its truth or falsity. *See Brady v. McAllister (In re Brady),* 101 F.3d 1165, 1172 (6th Cir.1996); *Arm v. A. Lindsay Morrison, M.D., Inc. (In re Arm),* 87 F.3d 1046, 1049 (9th Cir.1996). Scienter requires that Nappy must have made the representations with the purpose and intention of deceiving SMC. The debtor's fraudulent intent must operate at the time of the omission or misrepresentation for the indebtedness to be excepted from discharge. *Palmacci v. Umpierrez,* 121 F.3d 781, 787 (1st Cir.1997); *Kline's Service Center, Inc. v. Fitzgerald (In re Fitzgerald),* 109 B.R. 893, 900 (Bankr. N.D.Ind.1989). This intent may be inferred from an examination of the surrounding circumstances. *See Cowen v. Kennedy (In re Kennedy),* 108 F.3d 1015, 1018 (9th Cir.1997).

■ The facts clearly reveal that Nappy purposefully and intentionally engaged in a series of improper transfers of SMC's monies through the use of multiple accounts to embezzle client's monies for his own personal benefit. Nevertheless, SIPC did not sustain its burden of proving by the preponderance of the evidence that Nappy had the fraudulent intent at the time he, through JFA, persuaded SMC to entrust its monies with JFA. It seems to be a very fine point, but when the intent to divert a customer's funds is formed after the customer has entrusted those monies, that supports only the conclusion of law that somebody acting as Nappy engaged in embezzlement, but not common law fraud.

Therefore, the Court concludes that SIPC failed to prove its claim to except the indebtedness under § 523(a)(2)(A).

E. The Computation of the Judgment Amount.

■ Under the order of the United States District Court for the Eastern District of New York, the principal of the judgment debt owed by Nappy to SIPC, after crediting partial payments from him, was $583,044.48. Under 28 U.S.C. § 1961, "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." *See generally Cordero v. De Jesus–Mendez,* 922 F.2d 11 (1st Cir. 1990); *Georgia Ass'n of Retarded Citizens v. McDaniel,* 855 F.2d 794 (11th Cir.1988). The principal judgment amount of the $583,044.48 should be multiplied by the fraction whose numerator is $854,570 and whose denominator is $1,029,430 in order to derive the nondischargeable principal balance to which is added the accrued interest under section 1961 from the date of the initial judgment.

The evidence indicates that SMC ultimately suffered losses totaling $1,015,234.52 which SIPC had to fund in full from a combination of the net proceeds of liquidation and from member contributions. During the trial, Nappy stipulated to having received $800,000 of SMC's monies in his personal account. Independent of his stipulations, SIPC proved that his personal liability was $854,569.02, which includes that same $800,000 and the additional $54,569.02 of SMC's monies which were diverted by Nappy to the account of Tom Black and to two other brokers.

SIPC argued that this Court should hold Nappy liable for the full extent of SMC's Claim, and it places its primary reliance upon *In re Bilzerian,* 100 F.3d 886 (11th Cir.1996), which held:

granting a debtor a discharge based solely on the fact that he or she did not *directly* receive a benefit places a limitation on § 523 that is not apparent from the text of the provision itself. Moreover, such a limitation would provide a dangerous incentive for the sophisticated debtor, who could circumvent the provision by creating a shell corporation to receive the fruits of his or her fraud.

*Id.* at 891. (Emphasis in original.)

After carefully considering *Bilzerian* and its progeny, this Court is prepared to extend Nappy's nondischargeable liability to the additional diversion of the $54,570, as noted, but SIPC produced no evidence that Nappy actually ran another $200,000 or so of missing customer funds, on top of that, through other shell corporations so that he gained any personal benefit. At the end of the day, the terribly slipshod book-keeping by JFA and its affiliates may have resulted in an inability to trace another $200,000 through the system. SIPC can surely not be faulted for not trying to trace the funds—Mr. Barrow's charts are so meticulously prepared that it is unlikely that very many transactions escaped his scrutiny, but as he and Ms. Wang testified, SIPC's primary purpose is to preside over the allowance of customers' claims, and not to exhaust every errant dollar as if they were primarily fraud examiners.

Under the circumstances, the Court will enter a judgment of nondischargeability by separate order against the debtor, John Franklin Nappy, but in an amount to be determined based upon a further submission by SIPC which will use as a base the initial judgment amount by the district court, with a credit for any payments made by Nappy after that judgment was entered; then the net judgment amount should be multiplied by a fraction of which the numerator of $854,570 and the denominator is SMC's Claim of $1,029,430, to

which interest should be added at the statutory rate from the date of the district court's judgment to the date of entry of this judgment, with provision for the continued accrual of interest until it is collected in full.